UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| GAYLE BALLESTEROS, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | CV-06-105-B-W |
| ) | |
| BANGOR HYDRO-ELECTRIC ) | |
| COMPANY, ) | |
| ) | |
| Defendant. ) | |

**ORDER ON DEFENDANT'S MOTION
FOR JUDGMENT ON THE ADMINISTRATIVE RECORD**

Finding that Gayle Ballesteros failed to sustain her burden to demonstrate that Bangor Hydro Electric Company approved her for voluntary severance from employment, the Court grants Bangor Hydro's Motion for Judgment on the Administrative Record and upholds the denial of her claim for severance benefits.

**I. STATEMENT OF FACTS**

On January 2, 2005, Gayle Ballesteros (Ballesteros), under the impression that she would receive a severance package, informed her employer Bangor Hydro-Electric Company ("Bangor Hydro") she was leaving. Administrative Record ("AR") at 45 (Docket # 22). On January 3, 2005, Bangor Hydro denied her request for a severance package. Ms. Ballesteros objected, contending that Bangor Hydro should have met her expectations; after some administrative back and forth, she initiated this lawsuit. *Compl.* (Docket # 1).

Bangor Hydro initially responded by moving to dismiss Count II of the Complaint (Promissory Estoppel/The Reliance Doctrine), which the Court granted.[1] *Def.'s Mot. To*

---

[1] For details see *Ballesteros v. Bangor Hydro-Electric Co.*, 463 F. Supp. 2d 97 (D. Me. 2006).

*Dismiss Count II* (Docket # 6); *Order* (Docket # 17).  Bangor Hydro now moves for judgment on the administrative record as to Count I, the sole remaining count, (Claim for Benefits); Ms. Ballesteros opposes.  *Def.'s Mot for J. on Administrative R.* (Docket # 23) (*Def.'s Mot*.); *Pl.'s Obj. to Def.'s Mot. for J.* (Docket # 25) (*Pl.'s Opp'n*).

### A.  Ms. Ballesteros' Difficulties at Bangor Hydro Before Her Resignation

Sometime before resigning, Ms. Ballesteros began encountering difficulties with Luann Ballesteros, the wife of her ex-husband, concerning custody issues over the child of Ms. Ballesteros and her ex-husband.  Ms. Ballesteros' manager, Kathy Billings, documented these difficulties.[2]  A note dated December 10, 2004, recounts a discussion between Ms. Billings and Cindy Brewer, in Human Resources, about moving Ms. Ballesteros' office to avoid her working in such close proximity to Luann Ballesteros.  AR at 100.  Ms. Billings' note reflects that she preferred to have Ms. Ballesteros work in the Call Center rather than on the second floor of the office building.  *Id*.  A note dated December 21, 2004 reads:

> Following a conversation with Cindy Brewer during which she informed me the (sic) Gayle Ballesteros did not want to return to work, I spoke with Gayle at by (sic) telephone to ask her to reconsider her decision to quit work.  During my lengthy discussion with Gayle, I asked her not to rush into a decision about work and suggested that she at least give her new work environment in the Call Center a try.  She was quite adamant that she didn't want to work for the same company as Luann, but said she would think about the matter some more before making a final decision.

---

[2] Ms. Ballesteros takes issue with Ms. Billings' notes stating: "The notes from Kathy Billings included in the record are self serving statements and there is no indication that they were actually prepared contemporaneously with the events themselves."  *Pl.'s Opp'n* at 5.  Ms. Ballesteros suggests that the record contains significant factual disputes based on the times and dates of these notes.  The Court rejects Ms. Ballesteros' objection to the Billings memoranda.  The memoranda would be admissible as records of a regularly conducted activity under Rule 803(6).  FED. R. EVID. 803(6).  In reviewing the denial of Ms. Ballesteros' claim for benefits on appeal, Chris Huskilson seems to have checked with Kathy Billings, as he has included a handwritten note "Kathy confirms notes are accurate."  (Docket # 22-3); *see infra* I.C.  Moreover, this factual dispute is neither here nor there.  Ms. Ballesteros bears the burden of demonstrating she was entitled to benefits under the Plan.  *See infra* II.A-B.

AR at 99.  A note dated December 23, 2004 reads:

> I met with Gayle at her house to drop off a company Christmas present and to see how she was doing.  We revisited much of the conversation we had earlier in the week, but Gayle assured me that she was still thinking about whether she wanted to leave the company.  Again, I reassured her that we would do everything possible to minimize her exposure to Luann both in our current office space and in the new building.  She indicated that she appreciated all that we were attempting to do, but wasn't sure she could come back.  I told her to keep thinking about her decision and get back to me after Christmas.  I told her that if she decided not to come back, I would support her request for a severance package, but I was not the final decision maker.  I asked her what she would do if she didn't get the severance and she said she was not sure she could come back even if she didn't get the severance.  I told her we could discuss that further if the situation came to it.

AR at 98.  A note dated January 2, 2005 reads:

> Gayle called me at home on Sunday afternoon to tell me she would not be coming back to work.  She reiterated her feelings about working near Luann.  I told her I accepted her decision and would take her requested (sic) for a severance package to the executives.  I restated what I thought to be her position, which was if she can get a severance package she wouldn't come back to work, but if the severance was denied she would want the opportunity to reconsider her decision.  She said no that's not right.  I'm not coming back – even if I don't get the severance.  She told me she would call Cindy on Monday and get the paperwork going.

AR at 97.

### B.  The Initial Denial of Ms. Ballesteros' Claim for Benefits

Following her resignation on January 2, 2005, Ms. Ballesteros made an initial claim for benefits under the severance pay benefits plan (the "Plan") pursuant to 29 C.F.R. § 2560.503-1(j).  AR at 3.  Bangor Hydro's Plan reads: "If your employment with the Company has been involuntarily terminated, or if you have been approved for a voluntary severance from employment, you will receive a severance payment in an amount equal to

3

two weeks of your regular current weekly wages for each year of full time employment."

AR at 82.  Greg Hines, Director, Business Services, denied her claim.  AR at 3.  Mr. Hines determined that Ms. Ballesteros' decision to resign did not further the interests of Bangor Hydro, but instead required effort by Bangor Hydro to replace Ms. Ballesteros.  *Id*.  As such, Mr. Hines concluded she was neither involuntarily terminated nor approved for a voluntary severance, within the meaning of the plan document.  *Id*.

> An electronic note by Ms. Billings dated January 4, 2005 reads:

>> I spoke with Gayle to tell her that her request for a severance had not been approved.  I explained the reason the request was being denied was that her position was not being eliminated and that we would have to replace her. . . . She expressed and (sic) interest in speaking with Greg and I encouraged her to do that.

AR at 96.  The next day, January 5, 2005, Ms. Ballesteros met with Greg Hines and Kathy Billings.  Kathy Billings documented the encounter:

> Gayle came in today to discuss her request for a severance with Greg Hines and me.  Gayle started by bringing Greg up-to-date with the issues that have prompted her to resign and request a severance.  She discussed her health issues and personal issues between she and Luann Ballesteros which she says makes it impossible for her to return to work.  Greg explained that the reason her severance was being denied related to the fact that she was not being involuntarily severed nor could her position be eliminated.  He explained that the severance program was only used when there was a cost savings to the company associated with the elimination of a position of the combining of two positions into one as was the case with Joe Giard.  Greg asked Gayle to reconsider her decision to resign and offered her an extended leave of absence until she felt more ready to come back.  He encouraged her to utilize the Company's EAP program, but she declined.  Gayle expressed that she couldn't see any way that it would be possible for her to come back and further expressed that it wasn't fair that she was being denied the severance, especially after she was told earlier in December.  I asked her why she was of that understanding, to which she indicated Personnel said it was my decision.  I

4

> reminded Gayle that I told her on at least two occasions that I would support her request, but that I was not the final decision maker.

AR at 95.

### C. Ms. Ballesteros' Appeal of Her Claim for Benefits

On February 15, 2006, Ms. Ballesteros sent a letter to Bangor Hydro appealing the denial. AR at 45-46. The letter explains the difficulties she was having with Luann Ballesteros. AR at 45. Specifically, Plaintiff claimed that Luann Ballesteros had begun bringing child custody issues into the office, and asking to spend extra nights with the child. *Id*. Plaintiff did not feel she could refuse because Luann Ballesteros was in a managerial position higher than Plaintiff's position. *Id*. Plaintiff maintained that the situation had become even more stressful when her ex-husband moved to modify the divorce decree regarding custody for the child. *Id*. As a result, Plaintiff felt "that she was being harassed at her work environment. When [Plaintiff] went out on medical leave, she decided to request a voluntary severance pay package." *Id*. From here, the letter continues:

> It is Gayle Ballesteros position that she followed all of the necessary steps to apply for the voluntary severance package and that she was initially granted approval. She first discussed the issue of voluntary severance with Cindy Brewer, who worked in the Human Resource Department. Ms. Brewer informed Ms. Ballesteros that all she had to do was receive approval from her immediate supervisor, Kathy Billings. Nothing was ever stated about other executive approval.
>
> On December 14, 2004, while Gayle Ballesteros was at home on medical leave, she spoke with Kathy Billings. Kathy Billings stated, "No matter what, you have the severance – whether you decide to come back to work and try it for a while or you want it now". Kathy Billings never stated to Gayle that she was not the final decision maker on the severance package and she never stated that she would forward the request. She told her that she could have the severance pay package. Gayle Ballesteros then immediately called Cindy Brewer to inform

5

> her of the decision. Cindy Brewer stated that she was pleased that Kathy Billings agreed to the severance. She advised that Gayle wait until January 2, 2005 to call in the official decision so that Gayle could qualify for an additional year credit on the severance pay package.
>
> On January 2, 2005, Gayle Ballesteros called Kathy Billings at home to inform her of the official decision to leave the company. On January 3, 2005, Kathy Billings called Gayle and told her that the request had to go to Greg Hines for approval. This was never mentioned previously. She was also told on January 3, 2005 that the request had been denied.
>
> At a meeting on January 5, 2005, Gayle was informed that voluntary severance was only given when a position was downsized. This has not been true in the past. Joseph Giard was granted a voluntary severance package and his position was not downsized. After Gayle left the company, Luanne Ballesteros also left Bangor Hydro. She was granted a severance pay package and her position was not downsized. . . .
>
> The company has acted arbitrarily and capriciously in denying Gayle's claim for severance but approving LuAnne Ballesteros' claim and Joseph Giard's claim. In addition, there was benefit to Bangor Hydro in Gayle's voluntary severance by the fact that it was removing the potential for an ongoing harassment claim against the company due to Luanne's actions and her position at the company.

AR at 45-46. Finally, Ms. Ballesteros states that, while her claim for severance pay was pending, an unnamed corporate officer engaged in inappropriate conduct towards her, including inviting her to a local strip club; as such, she requested that "a different corporate officer review the denial of my claim for benefits so that the review is clearly impartial." AR at 46.

6

The President of Bangor Hydro, Robert Bennett, responded in a letter dated February 22, 2006, categorically denying any suggestion that he was the unnamed corporate officer.[3] He stated, however:

> [I]t matters not whether your accusations are true or false. You have made the accusations, and as a result, it would not be in the best interest of the Plan for me to be the reviewing officer for your claim. Consequently, in order to avoid even the appearance of bias, your appeal will be reviewed and decided by Chris Huskilson, the Chairman of the Board of the Company and the President and Chief Executive Officer of Emera, Inc., the Company's parent corporation. In deciding your appeal, Mr. Huskilson has full discretionary authority with respect to interpreting the Plan and determining your eligibility for benefits under the Plan. He will afford no deference to the initial adverse benefit determination and he is, of course, not subordinate to Greg Hines, who made the initial adverse benefit determination, or to myself.

AR at 7. Bangor Hydro mailed the record and materials related to Ms. Ballesteros' claim to Mr. Huskilson for his review. AR at 35-41.

### D.  The Denial of Ms. Ballesteros' Claim for Benefits on Appeal

On April 13, 2006, Mr. Huskilson sent Ms. Ballesteros a letter denying her claim for benefits under the Plan, explaining the rationale behind the ultimate decision:

> According to the Plan document, severance benefits are granted when the claimant's "employment with the Company has been involuntarily terminated, or if [the claimant has] been approved for a voluntary severance from employment."
>
> You were not involuntarily terminated.
>
> The practice of the Plan has been to approve an employee for a voluntary severance only if the Company's interests are either advanced or not injured by the employee's decision to leave.

---

[3] Mr. Bennett's letter reads: "In the final paragraph of your appeal letter you request that a different corporate officer review the denial of your claim for benefits, having described certain actions of an unnamed corporate officer in the penultimate paragraph. To the extent you refer to the undersigned, I categorically deny your version of events. I believe you must know things did not happen as you describe. As a human being, I cannot help but take offense at this groundless personal attack." AR at 7.

> The principal example of the latter are cost savings to the Company associated with the elimination of a position or the combining of two positions into one.
>
> In this case, the Company assured you it would do everything possible to minimize your exposure to a co-employee ("Ms. B") with whom you had personal issues having to do with child custody. The Company urged you not to resign and even offered you an extended leave of absence to reconsider your decision. At the same time you were informed that if you did resign, you would not receive benefits under the Plan because your position could not be eliminated and it could not be combined with another.
>
> Your resignation did not advance the interests of the Company and injured its interests to the extent of having to expend time and resources filling the position that you vacated. This is exactly the situation of an unapproved, voluntary separation in which benefits are not intended to be provided under the Plan.

AR at 4. Mr. Huskilson turned to each of Ms. Ballesteros' arguments in support of her claim.

With regard to her claim that she was initially approved for benefits, Mr. Huskilson wrote:

> On the contrary, you were told on December 23, 2004, that although Ms. Billings would support your request for benefits, she was not the final decision-maker. Ms. Billings informed you again on January 2, 2005, that she would need to take your application for severance benefits to executives for approval. You indicated to Ms. Billings that regardless of whether your application for severance benefits was approved you would leave the Company.
>
> Consequently, even if you were given incorrect information on December 14, 2004 (about which the Plan makes no determination), you had the correct information by December 23rd, in advance of your decision to leave. You also said you would leave even if your claim for benefits was denied. Under these circumstances, there is no unfairness to you that would warrant a deviation from the Plan's normal standard of granting benefits only for approved voluntary separations.

AR at 4. He addressed her claim that the Plan acted arbitrarily and capriciously when it denied her claim for benefits, but granted them to Luann Ballesteros and Mr. Giard. He wrote:

> [Luann Ballesteros] did not receive benefits under the Plan. Your argument with respect to her is invalid because it is based on this mistake of fact.
>
> As for [Mr. Giard], he was approved for voluntary separation because when he resigned, there was a combining of his old position into another that resulted in a cost savings to the Company. This was communicated to you at a meeting on January 5, 2005. Your argument with respect to [Mr. Giard] is likewise invalid because his was precisely the sort of situation in which the Plan is intended to provide benefits.

AR at 5. Finally, he turned to Ms. Ballesteros' intimation that Bangor Hydro did realize a benefit with her departure, namely avoiding an ongoing harassment claim. On this point, Mr. Huskilson states that there are "several reasons" why the Plan "cannot accept this argument for the granting of benefits." AR at 5. He explained that the Plan "does not accept the premise that you had . . . any sort of potentially valid harassment claim against [Bangor Hydro]." *Id*. Second, he wrote that "no applicable law prohibits harassment by a co-worker based on the factors you now imply." *Id*. Third, he stated that "even if you did have any sort of valid harassment claim . . . your leaving the Company would not have extinguished or defeated that claim." *Id*. Fourth, he explained that "avoiding a potentially valid harassment claim against the Company is not an appropriate basis on which to grant benefits under the Plan." *Id*.

## II. DISCUSSION

### A. Standard of Review

Ms. Ballesteros initiated this cause of action under section 502(a)(1)(b) of the Employee Retirement Income Security Act of 1974 (ERISA). 29 U.S.C. § 1132(a)(1)(B). The Supreme Court has held that "denial of benefits challenged under §1132(a)(1)(B) is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). Guided by *Firestone*, the First Circuit has said that the first inquiry is "whether the Plan expressly grants discretionary authority to the plan administrator to determine a claimant's eligibility." *Terry v. Bayer Corp.*, 145 F.3d 28, 36 (1st Cir. 1998). In *Terry*, the First Circuit stated: "We have steadfastly applied *Firestone* to mandate de novo review of benefits determinations unless a benefits plan . . . clearly grants discretionary authority to the administrator. Where the clear discretionary grant is found, *Firestone* and its progeny mandate a deferential arbitrary and capricious standard of judicial review." *Id*. at 37 (internal citation and quotation marks omitted).

Under *Firestone* and *Terry*, the threshold inquiry is whether the Plan language constitutes a clear grant of discretionary authority. The language of the Plan in *Terry* read:

> The Company shall have the exclusive right to make any finding of fact necessary or appropriate for any purpose under the Plans including, but not limited to, the determination of the eligibility for and the amount of any benefit payable under the Plans. The Company shall have the exclusive discretionary right to interpret the terms and provisions of the Plans and to determine any and all questions arising under the Plans or in connection with the administration thereof, including, without limitation, the right to remedy or resolve possible ambiguities,

> inconsistencies, or omissions, by general rule or particular decision.

*Id*. The court readily concluded that the grant of discretionary authority was clear. Conversely, in *Cooke v. Lynn Sand & Stone Co.*, the First Circuit determined that the "plan language was insufficient to satisfy *Firestone* [because] the plan language stated only that the administrator had 'exclusive control and authority over administration of the Plan.'" 70 F.3d 201 (1st Cir. 1995); *see also Cooke v. Lynn Sand & Stone Co.*, 875 F. Supp. 880, 883-84 (D. Mass. 1994).

Here, Bangor Hydro argues that the Plan accords it discretionary authority by stating: "if you have been *approved* for a voluntary severance from employment . . . you will receive a severance payment . . . ." *Def.'s Reply to Pl.'s Objection to Mot. for J. on the Administrative R.* at 1 (Docket # 27) (*Def.'s Reply*) (emphasis in original). This language, however, falls far short of the clear grant of discretionary authority the First Circuit required in *Terry*. At most the Plan states, by implication, that Bangor Hydro will pass on a claim for voluntary severance benefits; it makes no mention of the standard by which Bangor Hydro is to make that determination. The Court is unable to find any language in the Plan which grants discretionary authority to Bangor Hydro or, for that matter, any language at all concerning authority to administer the plan, discretionary or otherwise. This is plainly insufficient to satisfy a grant of clear discretionary authority.

Absent express language in the Plan assigning discretionary authority, the default standard of review is *de novo*, which is the standard the Court will apply. De novo review

> generally consists of the court's independent weighing of the facts and opinions in that record to determine whether the claimant has met his burden of showing he is [entitled to benefits] within the meaning of the [plan]. While the court does

11

> not ignore facts in the record, the court grants no deference to administrators' opinions or conclusions based on these facts.

*Orndorf v. Paul Revere Life Ins. Co.*, 404 F.3d 510, 518 (1st Cir. 2005); *see also Terry*, 145 F.3d at 34.

### B. Analysis

Bangor Hydro's severance pay plan is an employee welfare benefit plan under ERISA; unlike plans involving vested benefits, severance plan benefits have not vested until they are paid.[4] *Campbell v. BankBoston, N.A.*, 327 F.3d 1, 7 (1st Cir. 2003). As such, the Plan is "exempted from the stringent vesting, participation, and funding requirements of ERISA 'pension' benefit plans." *Bellino v. Schlumberger Techs., Inc.*, 944 F.2d 26, 29 (1st Cir. 1991). Nevertheless, ERISA subjects welfare benefit plans to "certain disclosure and fiduciary requirements." *Id.* For example, "such plans must be 'maintained pursuant to a written instrument' that provides 'for one or more named fiduciaries' who have 'authority to control and manage the operation and administration of the plan.'" *Id.* (quoting 29 U.S.C. § 1102(a)(1)). Although Congress "left the employer with considerable flexibility with respect to welfare plans, *Reichelt v. Emhart Corp.*, 921 F.2d 425, 429 (2d Cir. 1990), in exercising that authority, "the fiduciary must act 'in accordance with the documents and instruments governing the plan.'" *Bellino*, 944 F.2d at 29 (quoting 29 U.S.C. § 1104(a)(1)(D)).

The Court thus begins with the language of the Plan. It reads: "If your employment with the Company has been involuntarily terminated, or if you have been approved for a voluntary severance from employment, you will receive a severance payment . . . ." AR at

---

[4] Ms. Ballesteros alleged that the severance pay plan was an employee welfare benefit plan; Bangor Hydro admitted it was. *Compl.* ¶ 4; *Answer* ¶ 4 (Docket # 4).

12

82. It is undisputed that Ms. Ballesteros was not involuntarily terminated; the sole question is whether Bangor Hydro had approved her voluntary severance from employment.

Ms. Ballesteros bears the burden of demonstrating that she was entitled to benefits under the Plan. On this point, Ms. Ballesteros urges:

> The Defendant repeatedly states that to qualify for voluntary severance that the Plaintiff must establish that the Company's interests were advanced or not injured by her decision to leave. The Defendant gives as a primary example the combination of an employment position with another position. As mentioned previously, there are no internal guidelines concerning the interpretation of "voluntary severance" in the record. None were produced in response to a discovery request. Apparently, such internal guidelines do not exist. The plan itself never defines the criteria for a voluntary severance. There is absolutely no mention in the plan of a requirement that an employment position be combined with another. Although the Defendant has stated that there is such a requirement, the Defendant's statement does not make it so. It is the Plaintiff's contention that the Defendant has engaged in actions that are not warranted or authorized by the plan. In deciding her appeal, the Defendant has used improper criteria not spelled out in the plan.

*Pl.'s Opp'n* at 3. Her argument, however, misconstrues her burden and the inquiry into whether she was approved for voluntary severance, as required by the terms of the Plan.

On this record, the Court cannot conclude that Bangor Hydro approved Ms. Ballesteros for a voluntary severance from employment. Although Ms. Ballesteros argues Kathy Billings told her on December 14, 2004 that she was approved for severance benefits, the record reveals that on December 23, 2004 and January 2, 2005, Ms. Billings informed her that her request for severance benefits still needed to be approved and that Ms. Billings was not the final decision-maker. AR at 97-98. Thus, even if Ms. Ballesteros had initially been provided with incorrect information, she was well-armed with the correct information before tendering her resignation on January 2, 2005.

Moreover, after she resigned, Greg Hines met with Ms. Ballesteros, explained why she was not receiving a severance pay package, afforded her the opportunity to reconsider her resignation, and even offered her an extended leave of absence until she felt ready to return to work. AR at 95. Ms. Ballesteros declined Bangor Hydro's invitation. *Id*. In short, before Ms. Ballesteros offered her resignation she was aware, or should have been aware, that she might not receive severance benefits; after she resigned, Bangor Hydro provided her with an opportunity to change her mind and return to employment. In sum, the record evidence does not sustain Ms. Ballesteros' burden to demonstrate that Bangor Hydro approved her for a voluntary severance from employment.

Nor are Ms. Ballesteros' remaining arguments for why Bangor Hydro should have approved the benefits package availing, namely that (1) similarly-situated employees received severance benefits; and, (2) her resignation did provide a sufficient benefit to Bangor Hydro to award benefits. First, nothing in the record suggests that Plaintiff's position was either eliminated or combined with another position. In addition, there is evidence that Plaintiff's arguments concerning Luann Ballesteros and Joseph Giard are invalid. According to the record, Bangor Hydro did not give Luann Ballesteros a severance package; Ms. Ballesteros' argument on this point, therefore, is factually erroneous. Bangor Hydro gave Mr. Giard a severance package because his position was combined with another position that resulted in a cost saving to Bangor Hydro, an event consistent with a benefit to the company. In any event, Defendant correctly notes:

> Even if Ms. Ballesteros's allegations about Luann Ballesteros and Mr. Giard were correct (which they are not), Ms. Ballesteros is still not entitled to receive benefits under the Plan. On the contrary, 'the payment of benefits to other allegedly ineligible employees does not by itself give another ineligible employee a cause of action for benefits under 29

> U.S.C. § 1132(a)(1)(B).' *Vitale v. Latrobe Area Hospital*, 420 F.3d 278, 284 (3rd Cir. 2005).

*Def.'s Mot*. at 12. Nothing about Ms. Ballesteros' argument concerning either Luann Ballesteros or Mr. Giard suggests that she was entitled to severance benefits under the Plan.[5]

Second, the Court rejects Ms. Ballesteros' contention that her resignation provided a benefit to Bangor Hydro by avoiding a potential harassment claim. Bangor Hydro's position on Ms. Ballesteros' severance benefits belies her argument: Ms. Ballesteros' complaint is not that Bangor Hydro granted her insufficient payment in exchange for her forbearance, but rather that Bangor Hydro refused to pay her any severance benefits at all. If Bangor Hydro perceived Ms. Ballesteros' decision not to proceed with a harassment claim as a benefit, it is odd the Company elected to deny any payment in order to avoid a separate legal action. Moreover, Bangor Hydro's severance benefit plan is not the appropriate channel through which to air employment grievances nor is the payment of severance benefits an appropriate remedy for such grievances.

## III. CONCLUSION

The Court GRANTS Defendant's Motion for Judgment on the Administrative Record (Docket # 23) and upholds the denial of severance benefits to Ms. Ballesteros.

SO ORDERED.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
UNITED STATES DISTRICT JUDGE

Dated this 23rd day of July, 2007

---

[5] Ms. Ballesteros' argument is similar to the "speeder argument:" that the speeder should not be ticketed, because he and untold numbers of motorists traditionally exceed the speed limit on this stretch of road with impunity and because others that very day were traveling even faster. Although the argument has a certain sympathetic force, it is rarely, if ever, persuasive. Even if Bangor Hydro misapplied the Plan as regards Luann Ballesteros and Mr. Giard (which the Court concludes it did not), this is no argument that it must misapply the Plan again.